IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DAIRY PRODUCERS OF NEW
MEXICO,

       Plaintiff,

                                      No. CIV 99-568 MV/DJS

vs.

ANN M. VENEMAN, SECRETARY,
UNITED STATES DEPARTMENT OF
AGRICULTURE,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court as an appeal of administrative agency action under the Administrative Procedures Act, 5 U.S.C. § 706.  Pursuant to *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994), and this Court's order of June 10, 1999 **[Doc. No. 12]**, the parties filed briefs in accordance with the Federal Rules of Appellate Procedure. Having considered the briefs, administrative record, and relevant law, the Court finds that the agency action is due to be **AFFIRMED**.

## BACKGROUND

Plaintiff Dairy Producers of New Mexico ("Dairy Producers") is a trade association that represents dairy farmers in New Mexico and western Texas.  Defendant Ann M. Veneman is the Secretary of the United States Department of Agriculture ("the Secretary").[1]  At issue is the

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Veneman is automatically substituted for her predecessor in office, Dan Glickman.

disbursement of $200 million in emergency assistance to dairy farmers.

In October 1998 Congress enacted the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. Law 105-277, 112 Stat. 2681 (Oct. 21, 1998). This statute appropriated more than $3 billion in emergency assistance to farmers "for the loss of markets for the 1998 crop of a commodity."  Title XI, Agriculture Appropriations Act, § 1111(a). Of that amount, $200 million was made "available to provide assistance to dairy producers in a manner determined by the Secretary."  *Id.*, § 1111(d).[2]  This provision is referred to by the parties as the Dairy Market Loss Assistance program ("DMLA").

The Commodity Credit Corporation ("CCC"), an agency of the Department of

_____

[2] Section 1111 states in full:

> (a) In General.–Subject to section 1132 and except as provided in subsection (d), the Secretary shall use not more the $3,057,000,000 for assistance to owners and producers on a farm who are eligible for final payments for fiscal year 1998 under a production flexibility contract for the farm under the Agricultural Market Transition Act (7 U.S.C. 7201 et seq.) to partially compensate the owners and producers for the loss of markets for the 1998 crop of a commodity.

> (b)  Amount.–Except as provided in subsection (d), the amount of assistance made available to owners and producers on a farm under this section shall be proportional to the amount of the contract payment received by the owners and producers for fiscal year 1998 under a production flexibility contract for the farm under the Agricultural Market Transition Act.

> (c)  Time for Payment.–The assistance made available under this section for an eligible owner or producer shall be made as soon as practicable after the date of enactment of this Act.

> (d)  Of the total amount provided under subsection (a), $200,000,000 shall be available to provide assistance to dairy producers in a manner determined by the Secretary:  Provided, That no payments made under this section shall affect any decision with respect to rulemaking activities described under section 143 of Public Law 104-127.

Agriculture, was charged with carrying out assistance payments under the Agriculture

Appropriations Act. *Id.*, §§ 1131, 1133. On May 10, 1999, the CCC issued a decision and

regulations implementing the DMLA. 64 Fed. Reg. 24,933-24,936, codified at 7 C.F.R. §§

1430.501 *et seq.* These regulations made all dairy producers who marketed milk commercially in

the last quarter of 1998 eligible for a direct cash payment. 7 C.F.R. § 1430.504. Under the

program, payments were based on the amount of milk produced and marketed commercially in

either 1997 or 1998, subject to a maximum of 26,000 hundredweight ("cwt") of milk per

producer. 7 C.F.R. § 1430.502. 26,000 cwt is the approximate annual milk production of a 150-

cow dairy operation. The average dairy operation in the United States has 79 cows.

The application period for DMLA payments ended on May 21, 1999. To calculate the

payment rate, the CCC (1) converted the whole pounds of milk produced by each applicant in its

chosen year into cwt, (2) totaled the eligible cwt, not exceeding 26,000 cwt for any single

producer, and (3) divided the $200 million DMLA appropriation by the total eligible cwt. 7

C.F.R. § 1430.506(a). Each producer's payment was then calculated by multiplying this rate by

the producer's eligible production, subject to the 26,000 cwt maximum. 7 C.F.R. § 1430.506(b).

Dairy Producers complains that by basing each applicant's payment on a 26,000 cwt

maximum, the Secretary's regulations disproportionately favored small dairy farmers, despite the

fact that market risks apply uniformly to all dairy producers, large and small. It claims that

because the average dairy farmer in New Mexico produces 87,080 cwt of milk each year,[3] the

Secretary's 26,000 cwt maximum cost New Mexico dairy farmers $4 million in assistance. Dairy

---

[3] According to the Department of Agriculture, the average dairy operation in New Mexico
has 404 cows.

Producers challenges the legality of the 26,000 cwt maximum on two grounds.  First, it argues that § 1111 of the Agriculture Appropriations Act is an unconstitutional delegation of Congress's power to an executive agency.  Second, it argues that under the Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(A), the Secretary acted arbitrarily and capriciously in imposing the 26,000 cwt maximum.[4]

Dairy Producers filed this action on May 10, 1999.  On June 10, concluding that Dairy Producers had failed to establish irreparable injury, this Court denied its motions for a temporary restraining order and a preliminary injunction **[Doc. No. 11]**.  That same day, the Court informed the parties that it would treat Dairy Producers' challenge as an appeal from an agency decision and, accordingly, directed the parties to submit briefs pursuant to appellate briefing procedures **[Doc. No. 12]**.  The parties have done so.

The Court now reviews Dairy Producers' challenge to the Secretary's disbursement of the DMLA payments.  The Court finds that § 1111 of the Agriculture Appropriations Act does not violate the non-delegation doctrine, and that the Secretary's regulations imposing the 26,000 cwt maximum are not arbitrary and capricious.

## ANALYSIS

## I.      NON-DELEGATION DOCTRINE

Article I, § 1 of the Constitution vests the legislative powers of the federal government in Congress.  Although Congress may not delegate the power to make laws, it may, within certain limits, delegate to administrative agencies the authority to make policies and rules that implement

---

[4] Dairy Producers have relinquished their Equal Protection challenge.

its statutes.  *See Loving v. United States*, 517 U.S. 748, 771 (1996).  Delegation of policymaking

and rulemaking power is a necessity "in our increasingly complex society, replete with ever

changing and more technical problems"; Congress "simply cannot do its job absent an ability to

delegate power under broad general directives."  *Mistretta v. United States*, 488 U.S. 361, 372

(1989) (citations omitted).  As Chief Justice Taft explained:  "In determining what [Congress]

may do in seeking assistance from another branch, the extent and character of that assistance must

be fixed according to common sense and the inherent necessities of the government co-

ordination."  *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928).  So long as

Congress "shall lay down by legislative act an intelligible principle to which the person or body

authorized to [exercise the delegated authority] is directed to conform, such legislative action is

not a forbidden delegation of legislative power."  *Id.* at 409.[5]

Here, Dairy Producers contends that to the extent § 1111 of the Agriculture

Appropriations Act allowed the Secretary to impose a limitation on assistance payments like the

26,000 cwt maximum, Congress violated the non-delegation doctrine.  "Upon perusal of the

statute and its context," Dairy Producers argues, "there is no intelligible principle anywhere in the

DMLA that assists the Secretary in determining whether to impose limits, let alone what those

limits would be."

This argument is not well founded.  In applying the "intelligible principle" test, the

_____

[5] The Supreme Court has invalidated statutes under the non-delegation doctrine on only
two occasions, both in 1935:  *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495
(1935), and *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).  On February 27, 2001, the
Court ruled that Congress did not violate the non-delegation doctrine by giving the Environmental
Protection Agency the authority to set ambient air quality standards under the Clean Air Act.
*Whitman v. American Trucking Ass'ns, Inc.*, ___ U.S. ___, 2001 U.S. 182549 (Feb. 27, 2001).

Supreme Court has "deemed it 'constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.'" *Mistretta*, 488 U.S. at 372-73 (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946 )). With the DMLA, Congress clearly delineated its general policy: to provide partial compensation to dairy farmers who suffered market loss in 1998. Agriculture Appropriations Act, § 1111(a), (d). Congress also made clear that the Department of Agriculture (specifically, the Commodity Credit Corporation) had the authority to implement the DMLA. *Id.* §§ 1111(d), 1131, 1133. Finally, Congress set boundaries on the delegated authority by limiting the total amount that could be disbursed ($200 million), declaring that payments made under the DMLA could not affect decisions regarding rulemaking activities under a separate program, and directing payments to be made "as soon as practicable" after the program's enactment. *Id.* § 1111(c), (d).

Dairy Producers argues that the DMLA is constitutionally defective because it failed to prescribe a specific method of disbursement. It is well established, however, that Congress has the power to appropriate "lump-sum amounts without statutorily restricting what can be done with those funds"; such appropriations "give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln v. Virgil*, 508 U.S. 182, 192 (1993) (citations omitted). *See also Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321-22 (1937) (describing as "plain" proposition that Congress may appropriate funds to agencies without specifying "the particular uses to which the appropriated money is to be put").

If Congress has the power under the Constitution to appropriate lump-sums to agencies

6

without any restrictions at all, it may certainly appropriate funds in a more directed program like the DMLA without specifying a method of disbursement.  In *United States v. Roberts*, 185 F.3d 1125 (10th Cir. 1999), *cert. denied*, 120 S. Ct. 1960 (2000), the Tenth Circuit upheld an appropriation of $2 million to the Secretary of the Interior "for the purpose of providing lands to Indians."  *See* 25 U.S.C. § 465.  Even though Congress did not state the precise manner in which land was to be acquired, the court held that its delegation of authority to the Secretary of the Interior was constitutional.  185 F.3d at 1137.

Under the non-delegation doctrine, this Court would be justified in finding for Dairy Producers only if there were "an absence of standards for the guidance of the [agency's] action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed."  *Yakus v. United States*, 321 U.S. 414, 426 (1944); *Khan v. Hart*, 943 F.2d 1261, 1264 (10th Cir. 1991).  This is not the case:  the Court is fully able to decide whether the imposition of the 26,000 cwt maximum was a lawful means of executing the Secretary's duties under the DMLA.  The next section will address this very question.  Because § 1111 of the Agriculture Appropriations Act satisfies the "intelligible principle" test of *Mistretta*, Dairy Producers is not entitled to relief under the non-delegation doctrine.

## II.    ADMINISTRATIVE PROCEDURES ACT

### A.    Reviewability

Section 701 of the Administrative Procedures Act provides that an agency action is subject to judicial review except where there is a statutory prohibition on review or where the action is committed to agency discretion as a matter of law.  5 U.S.C. § 701(a)(1), (2).  The Secretary argues that the decision regarding how to disburse the $200 million was committed to

agency discretion by law and therefore not subject to review by this Court.  Because the

determination whether an agency action is subject to judicial review under § 701(a)(2) of the APA

is a jurisdictional issue, the Court must address it "as a threshold matter."  *Mount Evans Co. v.*

*Madigan,* 14 F.3d 1444, 1448 (10th Cir. 1994).

 The APA provides that "[a] person suffering legal wrong because of agency action, or

adversely affected or aggrieved by agency action within the meaning of a relevant statute, is

entitled to judicial review thereof." 5 U.S.C. § 702.  According to the Supreme Court, the APA

embodies a "basic presumption of judicial review."  *Lincoln v. Vigil,* 508 U.S. at 190 (quoting

*Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967)).  This is only a presumption,

however.  Under § 701(a)(2), agency action is not subject to judicial review "to the extent that"

such action "is committed to agency discretion by law."  The Supreme Court has interpreted §

701(a)(2) as precluding review "in those rare circumstances where the relevant statute 'is drawn

so that a court would have no meaningful standard against which to judge the agency's expertise

of discretion.'"  *Lincoln*, 508 U.S. at 191 (quoting *Heckler v. Cheney*, 470 U.S. 821, 830

(1985)).  "In such a case, the statute ('law') can be taken to have 'committed' the decision

making to the agency's judgment absolutely."  *Heckler,* 470 U.S. at 830.  *See also McAlpine v.*

*United States*, 112 F.3d 1429, 1433 (10th Cir. 1997); *Thomas Brooks Chartered v. Burnett*, 920

F.2d 634, 641-42 (10th Cir. 1990).

 One kind of agency action "traditionally regarded as committed to agency discretion" is

the "allocation of funds from a lump-sum appropriation."  *Lincoln*, 508 U.S. at 192.  *Lincoln*

involved a decision by the Indian Health Service to terminate a regional health program for

handicapped Indian children.  *Id.* at 184.  Congress had never expressly appropriated funds for the

program.  *Id.* at 186-87.  Nevertheless, the Service established the program and used a portion of

the annual lump-sum appropriations it received from Congress to pay for it.  *Id.* at 187.  After a

number of years, the Service discontinued the regional program and reallocated its resources to a

nationwide effort to assist such children.  *Id.* at 188.  Because Congress had merely appropriated

lump sum amounts to the Service without statutorily restricting what the agency could do with

those funds, and because Congress's appropriation acts did "not so much as mention" the regional

health program at issue, the Court held that the Service's decision was not subject to judicial

review.  *Id.* at 193-94.

       The Secretary argues that Congress's decision "not to limit the use of the funds" provided

for the DMLA "implicates the 'fundamental principle of appropriations law' referred to in

*Lincoln*," and, therefore, this Court lacks jurisdiction under the APA to review the Secretary's

method of disbursement.  The Court disagrees.  Unlike the regional health program in *Lincoln*,

Congress specifically authorized the DMLA.  Unlike the unrestricted lump-sum appropriation

given to the Indian Health Service, Congress here appropriated $200 million for a particular class

of individuals:  dairy producers who experienced market loss in 1998.  In making this

appropriation, Congress directed the Secretary to make payments "as soon as practicable" and

prohibited the payments from affecting decisions regarding rulemaking activities under a separate

program.  This case thus presents agency action far more circumscribed by Congress than that at

issue in *Lincoln*.  *See Mount Evans Co.*, 14 F.3d at 1450 (finding reviewable statute "in which

Congress has 'circumscribe[d] agency discretion to allocate resources by putting restrictions in

the operative statute[]'") (quoting *Lincoln*, 508 U.S. at 193).

       The Secretary contends that beyond designating the total sum of $200 million for the

DMLA, Congress "left additional allocation decisions to the discretion of the Secretary."

However, "the mere fact that a statute contains discretionary language does not make agency

action unreviewable."  *Beno v. Shalala*, 30 F.3d 1057, 1066 (9th Cir. 1994) (citation omitted).

The Court finds that the language of § 1111 and expressed purposes of the omnibus statute

provide a meaningful standard by which it can judge the Secretary's decision to impose the

26,000 cwt maximum on assistance payments.  The "very narrow exception" of unreviewability

under the APA does not apply.  *See McAlpine*, 112 F.3d at 1433 (quoting *Citizens to Preserve*

*Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)).

> **B.     Merits**

In reviewing an agency's interpretation of a statute that Congress charged it to administer,

this Court must first ask "whether Congress has directly spoken to the precise question at issue."

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984).  "If

the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency,

must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842-43.

In this case, Dairy Producers asserts that, properly construed, § 1111 of the Agriculture

Appropriations Act made clear that the Secretary does not have the authority to limit assistance

payments based upon size of production; instead, the Secretary's role is limited "to paying

producers pro rata on all of their productions."  This assertion is unfounded.  Section 1111(d)

provided that "$200,000,000 shall be available to provide assistance to dairy producers in a

manner determined by the Secretary."  It did not specify how this assistance should be disbursed,

but instead left this determination to the Secretary.[6]

Dairy Producers argues that this statute should be construed in light of past dairy legislation and assistance programs: "Without exception these programs have translated at the producer level into a uniform rate of payment or assessment on all milk regardless of the size of the farm the milk came from. Milk is milk." This Court recognizes that it may use "traditional tools of statutory construction" to determine the clear intent of Congress, *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446-48 (1987); *Chevron*, 467 U.S. at 843 n.9, and legislative history "is among the most frequently used of these tools," *Exxon Corp. v. Lujan*, 970 F.2d 757, 761 (10th Cir. 1992) (citing *Salt Lake City v. Western Area Power Admin.*, 926 F.2d 974, 978-79 (10th Cir. 1991)). However, because legislative history is a step removed from the language of the statute and "imperfectly reflects collective judgment," the history must be "extremely clear" for it to establish Congress's clear intent for *Chevron* purposes. *Id.* Here, Dairy Producers cites a variety of other statutes and administrative regulations (both preceding and following § 1111(d)) involving dairy assistance programs. The Secretary criticizes Dairy Producers' discussion of dairy policy as selective and misleading. Even if this Court assumes its complete accuracy, the discussion is far too attenuated to establish the clear intent of Congress regarding the disbursement of assistance payments under § 1111(d). *Cf. Arco Oil & Gas Co. v. Environmental Protection Agency*, 14 F.3d 1431, 1435 n.4 (10th Cir. 1993) (stating that "post-enactment legislative history carries little weight in our effort to ascertain Congress' original intent") (citing

---

[6] The Court finds unconvincing Dairy Producers' textual argument that the phrase "in the manner determined by the Secretary" modifies only "the verb 'provide', or the *process* of providing the assistance. It is not an adjectival phrase as would be required for a modification of 'assistance', or the object." Under this parsing, a haircut provided "in the manner determined by the customer" would involve only a choice of scissors, not hairstyle.

*United States v. Price*, 361 U.S. 304, 313 (1960)).  Indeed, as the Secretary points out, the fact

that in past dairy legislation Congress restricted the Secretary's discretion to distribute assistance

payments "bolsters the conclusion that, in this case, by allowing the Secretary the discretion to

determine the manner in which DMLA funds would be distributed, Congress chose to impose no

legally-binding restrictions."

Because § 1111(d) delegates to the Secretary the authority to determine the manner in

which the $200 million should be disbursed to dairy producers, this Court must give the

Secretary's determination controlling weight unless it is "arbitrary, capricious, or manifestly

contrary to the statute."  *Chevron*, 467 U.S. at 844.  In reviewing an agency action under the

"arbitrary and capricious" standard, this Court must determine whether the agency "examined

relevant data and articulated a rational connection between the facts found and the decision

made."  *Olenhouse*, 42 F.3d at 1574 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins.

Co.*, 463 U.S. 29, 43 (1983)).  It must set aside the action "if the agency relied on factors which

Congress has not intended for it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise."  *Motor Vehicle Mfrs.*, 463 U.S. at 43.  The basis for the agency's action must

be clearly disclosed in and sustained by the administrative record.  *Id.* at 50; *Olenhouse*, 42 F.3d

at 1575.[7]  While the action is entitled to a presumption of regularity, "that presumption is not to

shield [the] action from a thorough, probing, in-depth review.'"  *Overton Park*, 401 U.S. at 415.

---

[7] In an order dated February 3, 2000 **[Doc. No. 27]**, the Court rejected Dairy Producers'
argument that the Court's review should be limited to materials disclosed in the Federal Register,
as opposed to the entire administrative record certified by the Secretary.

Here, the administrative record shows that in the spring of 1999, before promulgating the DMLA regulations, the Secretary reviewed a number of recent developments in dairy markets, including the precarious situation of small dairy farms in the United States.  A decision memorandum for the Secretary observed that "[w]ith several thousand mostly smaller dairy farms going out of business every year, a case may be made that smaller producers have been more adversely affected by declining real milk prices over the years."   The memorandum cited a recent report by the Department of Agriculture, *A Time to Act:  A Report of the USDA National Commission on Small Farms* (Jan. 1998), a copy of which is contained in the administrative record.  This report identified several public values served by small farms, including diversity of ownership, cropping systems, landscapes, biological organization, culture and traditions; environmental benefits; more equitable economic opportunity for people in rural communities; the passing of farming skills from one generation to the next; and increased economic vitality through dispersed farm operations.  In the Conference Report accompanying the Omnibus Consolidated and Emergency Supplemental Appropriations Act (which contained the Agriculture Appropriations Act), Congress urged "the Secretary to coordinate activities and to encourage policy considerations within existing programs of the Department that promote the needs of small farm operators and that may help reverse the unwarranted decline in small farm operations."

In deciding how to disburse the $200 million in DMLA assistance, the Secretary considered five options.  Option 1 made a single, equal payment to each eligible dairy operation, regardless of its milk production.  Option 5 prorated payments according to each operation's total production in 1997 or 1998.  Options 2, 3, and 4 also prorated payments by production, but

13

limited payments by (respectively) 17,000, 26,000, and 34,000 cwt maximums.[8]

In a cost-benefit assessment, the Secretary estimated that the payment rate under Option 1 would be $1,714 per dairy operation.  "About 29 percent of the $200 million, $57.3 million, would go to the 33,420 operations which milk under 30 cows.  Only six percent, or $12.4 million, of the assistance would go to the 7,250 operations with over 200 cows, which produce 45 percent of the nation's milk supply."  By contrast, under Option 5 – the option that Dairy Producers contends was mandated under § 1111 – "45 percent of the market loss payments would go to the 6.2 percent of farms with over 200 cows."  By selecting Option 3, the Secretary effectively staked out a middle ground between these two extremes.  The Secretary chose to avoid "singularly large payments" by providing assistance to "family-sized farms" for a larger portion of their market losses.  At the same time, the Secretary maximized assistance to larger farms by imposing a cwt cap that limited payments only to farms with herds twice the size of the national average.

The Court concludes that the Secretary's selection of this method of disbursement was within the scope of the Secretary's delegated authority and not arbitrary and capricious.  The Secretary examined relevant data, disclosed those data in the administrative record, and articulated a rational basis for the decision made.  Contrary to Dairy Producers' argument, it was not improper for the Secretary to consider the adverse effect of declining milk prices on small dairy producers; in enacting the omnibus statute containing the DMLA, Congress urged the Secretary "to coordinate activities . . . that promote the needs of small farm operators and that may help reverse the unwarranted decline in small farm operations."  The Secretary's decision to

---

[8] 17,000 cwt is the average annual milk production of a 100-cow farm; 26,000 cwt is the average production of a 150-cow farm; 34,000 cwt is the average production of a 200-cow farm.

implement the 26,000 cwt maximum "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute," *Chevron*, 467 U.S. at 845 (quoting *United States v. Shimer*, 367 U.S. 374, 382 (1961)), and this Court will not disturb the decision simply because the policies may have been accommodated differently.  *See also id.* at 843 n.11 ("The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.") (citations omitted).[9]

---

[9] Because the Court finds that the Secretary's action is, on its own terms, a lawful exercise of delegated authority under the 1999 Agriculture Appropriations Act, the Court declines to address the Secretary's argument, presented in supplemental briefing, that Congress ratified this action by passing the Act Making Appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Programs for the Fiscal Year Ending September 30, 2001, and for Other Purposes, Pub. L. No. 106-387 (Oct. 28, 2000).  The 2001 Act authorized the Secretary to make DMLA payments "in a manner consistent with and subject to the same limitations on payments and eligible production which were applicable to the payments that were made to dairy producers" under the 2000 Agriculture Appropriations Act, "except that a producer may be paid for production up to 39,000 cwt."  The 2000 Agriculture Appropriations Act appropriated $125 million for the DMLA, and the Secretary implemented the same method of disbursement as that at issue here with respect to the 1999 Agriculture Appropriations Act.

## CONCLUSION

**IT IS THEREFORE ORDERED** that the Plaintiff's Motion for Judgment in Its Favor is

**DENIED**.  The decision of the Secretary is **AFFIRMED**.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE

Attorney for Plaintiff:
Benjamin F. Yale

Attorney for Defendants:
Rupa Bhattacharyya

16